# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **MARK ANTHONY HAIRSTON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18CV00003 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ROYAL BUILDING PRODUCTS, INC.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Thomas E. Strelka, Strelka Law Office, PC, Roanoke, Virginia, for Plaintiff;*
*Yvette V. Gatling, Littler Mendelson, P.C., McLean, Virginia, for Defendant.*

In this employment discrimination case, the plaintiff asserts claims of race-based discrimination, retaliation, and hostile environment harassment under Title VII of the Civil Rights Act of 1964 (Title VII) and 42 U.S.C. § 1981. The defendant has moved for summary judgment on all of the claims. I conclude that genuine issues of material fact preclude the entry of summary judgment, and I will therefore deny the defendant's motion.

## I.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence or non-existence could result in a different jury verdict. *JKC Holding Co. v. Wash. Sports*

*Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). When ruling on a summary judgment motion, the court should consider the parties' pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). The court may not assess credibility on a motion for summary judgment. *Id.* at 569.

"Only evidence that would be admissible at trial may be considered for summary judgment purposes." *Hunter v. Prince George's Cty.*, 36 F. App'x 103, 106 (4th Cir. 2002) (unpublished).[1] "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The burden is on the proponent of summary judgment material to show its admissibility. Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendment.

---

[1] RBP has not objected to my consideration of any of the plaintiff's evidence on the ground that it would not be admissible at trial.

Rule 56 requires a party to support its assertion of facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). To the extent that the plaintiff's brief contains unsupported assertions, I will not consider them in deciding the Motion for Summary Judgment. The recitation of the facts set forth below includes only those facts found in the record in evidence that would likely be admissible at trial.

## II.

The following facts taken from the summary judgment record are either undisputed or, where disputed, are stated in the light most favorable to the plaintiff.

The plaintiff, Mr. Hairston, is black. Beginning in February 2015, he worked for defendant Royal Building Products (RBP) as a Senior Human Resources Business Partner (Senior HRBP) at its Marion, Virginia, and Bristol, Tennessee, manufacturing facilities. At the time Hairston was hired, John Gargaro and Larry Peterson, both white, were Plant Managers. Although the decision to hire Hairston was ultimately made by RBP's corporate office, Gargaro advocated against hiring Hairston and Peterson lobbied in favor of hiring Hairston. Hairston's offer letter stated that he would be reporting to the Director of Human

Resources "with a dotted line relationship to plant management of our plants in Marion, Virginia and Bristol, Tennessee." Def.'s Mem. Supp. Ex. 1 at 1, ECF No. 95-2.

Shortly after beginning his new role as Senior HRBP, Hairston met with black employees who worked in manufacturing roles at the Marion plant. These employees expressed to Hairston that they had experienced or witnessed racism at the plant. The employees specifically indicated that Gargaro and Plant Engineer Greg Brown, who was white, held racist views. Not long after Hairston began his employment with RBP, he received harassing phone calls at the plant in which an unidentified individual stated, "Nigger, you need to leave here." Pl.'s Br. Opp'n Ex. 1, Hairston Dep. 187-88, ECF No. 113-1. Hairston reported the calls to his supervisor.

Hairston's initial supervisor was Director of Human Resources Stephen Ryan, who was based in Canada. For his new position, Hairston had to relocate from Martinsville, Virginia, to Abingdon, Virginia, which is situated between Bristol and Marion. Hairston's family remained several hours away in Martinsville. Hairston was initially allowed to use a company vehicle to travel from Abingdon to Martinsville during the relocation process, in accordance with company policy. Hairston became aware that Gargaro did not approve of Hairston using the company car to travel home to Martinsville, so Hairston only used the

company car for that purpose a handful of times. Caucasian employees were permitted to use the company car for relocation purposes for a much longer period of time than Hairston.

Gargaro prevented Hairston from using a company vehicle to travel between the Marion and Bristol plants. Gargaro allowed white employees to freely use company vehicles for that purpose. Hairston sought from Ryan permission to hire a subordinate employee. Ryan granted him permission to do so, and Hairston hired someone. This angered Gargaro, who then insisted that Hairston report his activities to Gargaro, despite the fact that Gargaro was not Hairston's direct supervisor. At some point, Gargaro told Hairston that he was causing problems.

Hairston was the only black management-level employee at the Marion and Bristol plants. At some point, Brown became the plant manager of the Bristol facility. Brown and Gargaro held weekly managers meetings to which they did not invite Hairston. When Hairston eventually learned of the meetings, he insisted that he be included in them, and he ultimately was. During a training event at RBP's Columbus, Ohio, plant, Hairston was excluded from social activities by his white peers. John McKinnon, Gargaro's supervisor, invited Gargaro and Brown to have dinner with him but did not invite Hairston, who was standing near them at the time McKinnon extended the invitation. The Senior HRBP position description stated that Hairston was supposed to spend "30% of the time operating as a

strategic partner to leaders, 40% of the time operating as an engagement partner, and the remaining 30% of the time handling employee relations." Def.'s Mem. Supp. Ex. 3, ECF No. 95-4. Hairston felt that by excluding him, Gargaro, Brown, and McKinnon were refusing to partner with him and effectively preventing him from doing his job.

Ryan gave Hairston permission to leave work in the early afternoon on Fridays so that he could travel back to Martinsville to spend the weekend with his family. Hairston would return to Abingdon on Sunday evenings and report to work promptly on Monday mornings. Hairston's white peers frequently complained to Ryan and his successor, Ted Marsh, that Hairston was absent. They falsely accused him of not being at work on Mondays and Fridays and complained that he was unavailable when he was in fact on site at the other plant. Ryan investigated these complaints and determined that they were unfounded. Gargaro, however, urged Ryan to terminate Hairston's employment. On several occasions in 2016, Brown told Hairston that Gargaro did not like black people and was trying to get Hairston terminated because he was black.

While Ryan was investigating complaints regarding Hairston's attendance and availability, Ryan and Hairston went out to dinner together. Hairston related to Ryan that he felt he was being subjected to a hostile work environment by Gargaro and Brown. Company policy provided that an employee's direct

supervisor was an appropriate person to whom to report racial discrimination, retaliation, and harassment. Hairston told Ryan that Gargaro had purposely excluded him from meetings and that he had heard from others that Gargaro had called him a "nigger" and did not like black people. Hairston Dep. 121, ECF No. 113-1. Ryan expressed sympathy and said that he would protect Hairston.

In December 2016 at a company awards dinner, Brown and Maintenance Manager Randall Jacobson approached Hairston and commented about police lights outside the venue. Brown remarked that Hairston "better go move [his] car, . . . because the police don't like blacks," and Brown added, "you know the police beat blacks." *Id*. at 139.

In December 2016, Hairston complained to Ryan and then Marsh that he felt he was being subjected to a racially hostile working environment. Ben Adams, a white managerial employee, had told Hairston that Brown had referred to Hairston as a "nigger" in a text message and had otherwise disparaged Hairston on account of his race. *Id*. 133-34. Hairston relayed this information to Ryan and Marsh. In January 2017, shortly after Marsh became Hairston's supervisor, Marsh responded to Hairston's complaints by suggesting that he "just leave and quit and move back home." *Id*. 146. The record contains no evidence that Ryan or Marsh investigated Hairston's complaints of harassment or Brown's alleged use of a racial slur prior to Hairston's termination.

RBP asserts that Hairston was terminated as part of a reduction in force because the human resources department was overstaffed due to the acquisition of RBP's parent corporation by Westlake Chemical Corporation (Westlake). It has conceded, however, that Hairston was the only person whose position was eliminated as part of that particular restructuring.[2] Hairston, whose job responsibilities as Senior HRBP had included participating in terminations, testified in his deposition that reductions in force were essentially pretexts used to terminate undesired employees or to shift employees to preferred roles.

On February 21, 2017, Marsh, an employee of Westlake, told Hairston that Hairston's employment was being terminated due to a reduction in force. Marsh testified that Hairston was chosen as the HRBP to be terminated through the use of a slating process, but the metrics used in the slating process were subjective and substantially relied on input from Gargaro and Brown. Marsh testified, "What I did was ask them just in general questions: How does Mr. Hairston do, you know,

---

[2] Counsel for RBP made this concession in a hearing before Magistrate Judge Sargent. In support of its Motion for Summary Judgment, however, RBP has submitted an affidavit of Marsh stating that another employee named Maggie Webb, a white female, was also terminated as part of the same restructuring of the human resources department. RBP's counsel has represented to the court that she did not actually intend to concede that the plaintiff was the only person terminated in the restructuring. For the purpose of deciding the Motion for Summary Judgment, I must view the evidence in the light most favorable to the plaintiff. At a minimum, counsel's apparent concession before Judge Sargent creates a dispute of fact as to whether the plaintiff was the only person terminated in the purported reduction in force. Drawing all inferences in the plaintiff's favor, as I must at this procedural juncture, I will consider the plaintiff to have been the only member of the human resources department terminated in the restructuring.

what does he do, how does he do it, those type of questions, what's been your experience that he's supporting both of you as plant managers, et cetera." Def.'s Mem. Supp. Ex. 10, Marsh Dep. 37, ECF No. 95-11.

Marsh testified that Hairston had scored lower than the other employees on the managerial metric. At the time Marsh sought feedback regarding Hairston's performance, he was aware of Hairston's complaints that Brown and Gargaro had been subjecting him to a racially hostile work environment. Not long before Marsh conducted the slating process, Ryan had told Marsh that Hairston was "a good HR business partner, that he had a good relationship with a lot of people in the plant, especially frontline supervisors and employees on the shop floor." Pl.'s Br. Opp'n Ex. 2, Ryan Dep. 15, ECF No. 113-2. Ryan had also told Marsh that there was tension between Hairston and Brown and that other supervisors also experienced tension with Brown.

The individuals involved in the slating process included the plant managers for the Bristol and Marion plants, the director of manufacturing, the group vice president, Marsh, the talent management director, internal counsel, and the vice president of human resources. According to Marsh, no one individual had sole authority for terminating Hairston. Rather, pursuant to a delegation of authority document, Marsh solicited input and made a recommendation which was then

approved by both the director of talent management and internal legal counsel Joel Gray.

Four people were assessed through the slating process, and Hairston received the lowest score. The other three people were white. The highest scoring person, Kim Agner, was selected to fill the newly created role of Manager — Human Resources. There is some dispute about whether this new role was a promotion or lateral move for Agner.

Adams testified that shortly after Hairston was terminated, Brown made a statement to the effect of "'we're finally rid of the [nigger],' or 'they finally got rid of the [nigger],' or 'we're finally done with the [nigger].'" Pl.'s Br. Opp'n Ex. 4a, Adams Dep. 12, ECF No. 113-7. Adams reported the comment to human resources, and Brown was ultimately terminated approximately two months after Hairston's termination. Brown's use of the racial slur was one reason for his termination.

RBP had an Equal Employment Opportunity and Harassment Policy, which Hairston acknowledged receiving at the beginning of his employment. After Westlake acquired RBP, Hairston received a copy of Westlake's Code of Conduct, which contained several provisions related to employment discrimination and harassment. The Code of Conduct states that "[a]ny form of harassment including unlawful harassment based on race" is "unacceptable." Def.'s Mem. Supp. Ex. 5

at 3, ECF No. 95-6.  The Code encourages employees to "report your concerns to your immediate supervisor, manager, any Human Resources Representative or the Office of the General Counsel."  *Id.* at 5.  The Code prohibits managers from taking retaliatory action against anyone who reports a concern about unethical or illegal conduct.  In a section entitled Equal Employment Opportunity, the Code states, "It is Westlake's policy to ensure equal employment and advancement opportunity for all qualified individuals without distinction or discrimination because of race . . . ."  *Id.* at 15.  The next section, entitled Harassment, states that "Westlake will not tolerate any harassment of any kind."  *Id.* at 16.  It further reads,

> Complaints about harassment by a Westlake employee or any other person with whom Westlake does business can be made to My Safe Workplace, your supervisor, the Human Resources department and/or the Office of the General Counsel of Westlake.  You may choose any of these alternatives to make a complaint and you do not need to complaint to the person who you feel is harassing you.
>
> Any complaints will be promptly, fairly and thoroughly investigated consistent with the law, including following any requirements under collective agreement or regulation.  There will be no retaliation for truthfully reporting harassment or participating in Westlake's investigation of a complaint.

*Id.*

III.

A. *Discriminatory Discharge.*

Title VII prohibits an employer from discriminating against an employee based on the employee's race. *See* 42 U.S.C. § 2000e–2(a)(1).[3] There are two alternative methods of stating a Title VII claim for discrimination: the mixed-motive framework, in which "it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons"; or the pretext framework, "under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284, 285 (4th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 807 (1973)). Under either theory, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).

---

[3] Section 1981 "affords no greater substantive protection than Title VII." *Netter v. Barnes*, 908 F.3d 932, 937 n.1 (4th Cir. 2018) (citation omitted); *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (explaining that standards developed for Title VII are regularly applied to § 1981 discrimination and retaliation claims). Therefore, the court's analysis of Hairston's Title VII claims will also apply to his corresponding § 1981 claims.

"Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks and citation omitted). "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Id.* "Isolated remarks unrelated to the challenged employment decision are insufficient to provide direct evidence of discrimination." *Finkle v. Howard Cty.*, 640 F. App'x 245, 248 (4th Cir. 2016) (unpublished).

A plaintiff who has no direct evidence of discrimination can proceed under the *McDonnell Douglas* burden-shifting framework. Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie case of employment discrimination. In most cases, a prima facie case consists of proof that: (1) he is a member of a protected class; (2) he was qualified for his position and his performance was satisfactory; (3) he suffered an adverse employment action; and (4) he was replaced by an individual outside of the protected class. *McDonnell Douglas*, 411 U.S. at 802. In reduction-in-force cases, however, the prima facie case differs somewhat, particularly as to the final element. Because RBP contends that Hairston was terminated in a reduction in force, Hairston is "required to show that [his] job duties were absorbed by employees not in the protected class or

otherwise show that [RBP] did not treat [Hairston's] protected characteristics neutrally when deciding to terminate [him]." *Guessous*, 828 F.3d at 219.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to respond with evidence that it had a legitimate, non-discriminatory reason for its action. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). If the defendant is able to make this showing, the burden shifts back to the plaintiff to present evidence that the defendant's articulated reason was pretext for unlawful discrimination. *Id.* "Although the evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, Brown's statement to Adams immediately after Hairston's termination qualifies as direct evidence that racial discrimination played a role in the termination. RBP contends that Brown's use of a racial slur to refer to Hairston is merely an isolated comment by a nondecisionmaker, but that is not an entirely accurate reading of the record. Marsh testified that there was no sole decisionmaker with respect to Hairston's termination. Brown was one of a handful of people who provided input to Marsh that resulted in Marsh giving Brown a low score on the slating document, which led to his termination. Hairston had a

"dotted-line relationship" to Brown, the plant manager of one of the two plants for which Hairston was responsible, suggesting that Brown had at least some supervisory authority over Hairston. Marsh, who collected the information for the slating process, had only known Hairston for a short time and was an employee of Westlake, not RBP. Brown and Gargaro were the managerial representatives of RBP who gave feedback that led to Hairston being given a low score on the slating document. And while Marsh may not have expressly told Brown why he was asking about Hairston, a jury could infer that Brown understood that Marsh, a senior human resources executive from the parent company that recently acquired RBP, was asking questions about Hairston's performance in order to evaluate him for termination. Moreover, Brown's comment expressly referred not just to Hairston, but to his termination. I conclude that Brown's statement is sufficient direct evidence of discrimination for Hairston to meet his burden of production and survive summary judgment as to Count I.

Even if the comment were not direct evidence of discrimination, I conclude that Hairston has satisfied his initial and ultimate burden of production under the *McDonnell-Douglas* burden shifting test. As to the prima facie case, there is no dispute that Hairston is a member of a protected class and suffered an adverse employment action when he was terminated. Ryan's testimony satisfies Hairston's burden of establishing that he was performing satisfactorily. And of the four

employees who were considered in the slating process, the two who were allowed to keep their jobs and who absorbed Hairston's duties were both outside of the protected class.

RBP has offered a legitimate, nondiscriminatory reason for terminating Hairston: his position was eliminated in a reduction in force following RBP's acquisition by Westlake. The burden therefore shifts back to Hairston to offer evidence from which a jury could conclude that RBP's proffered reason was untrue and a pretext for race-based discrimination. He has met this burden. Based on Brown's statement following Hairston's termination, Ryan's testimony that Brown and Hairston had a tense and unfriendly relationship, and Hairston's own testimony about what Brown and others said to him,[4] reasonable jurors could find

---

[4] RBP disregards most of Hairston's testimony and argues that the court cannot consider the plaintiff's self-serving statements when deciding a motion for summary judgment. But counsel for RBP misconstrues the law on this point. The Fourth Circuit has said that "a self-serving *opinion* . . . cannot, absent objective corroboration, defeat summary judgment." *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) (emphasis added). Here, Hairston is not offering his own opinions regarding his job performance or the reason for his termination. He can competently testify about events he witnessed and statements that company representatives made to him. Those are facts, not opinions. That other witnesses contradict aspects of his testimony simply creates factual disputes that must be resolved by a jury, which will have to assess the credibility of Hairston and of other witnesses. *See Lee-Thomas v. Prince George's Cty. Pub. Sch.*, Civil Action No. DKC 15-2010, 2017 WL 2733802, at *6 (D. Md. June 26, 2017) (summarizing Fourth Circuit cases regarding plaintiffs' self-serving affidavits and explaining that the general rule is "that a court should not weigh the credibility of testimony of one party against the testimony of another at the summary judgment stage, even if it is self-serving"). Additionally, Hairston's testimony is corroborated at least in part by the testimony of Ryan and Adams, who confirm that Hairston was good at his job,

that the slating process was pretextual and that race-based discrimination was the real reason Hairston was terminated.

## B.  Retaliatory Discharge.

To succeed on a claim of retaliation under Title VII, a plaintiff must prove three elements:  "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action."  *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997) (citation omitted). Protected activity includes complaints about race-based harassment that the employee reasonably believes is creating a hostile work environment.  *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015).  Regarding the third element, "[a] plaintiff's own self-serving opinions, absent anything more, are insufficient" to prove that an adverse employment action was linked to protected activity.  *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004).  To establish causality, the protected activity "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Reeves*, 530 U.S. at 141 (internal quotation marks, citation and alterations omitted). "It is the perception of the decision maker which is relevant to the question of retaliation . . . ."  *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir.

that he had a strained relationship with Brown, and that Brown did in fact hold racist views and was happy when Hairston was terminated.

1998), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Here, the record evidence, viewed in the light most favorable to Hairston, establishes that Hairston engaged in the protected activity of reporting racial harassment to his direct supervisors. It is undisputed that his termination was an adverse employment action. As to causation, there is evidence that Marsh recommended Hairston's termination within two months of when Hairston complained to Marsh about what he perceived to be a racially hostile environment. Marsh had also allegedly responded to Hairston's complaints by suggesting that Hairston resign. While temporal proximity is not always sufficient to infer causation, in this case, I find that when coupled with Marsh's alleged advice, the short length of time between Hairston's complaints and his termination are enough to overcome RBP's summary judgment motion on the retaliation claims.

*C. Hostile Environment Harassment.*

The language of Title VII "is not limited to economic or tangible discrimination," but also includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment." *Id.* (internal quotation marks and citations omitted). To prevail on a Title VII claim of a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer– Liberto*, 786 F.3d at 277 (internal quotation marks and citations omitted). "Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiffs position," and may be determined based on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks and citations omitted).

I "must look at all the circumstances to determine whether a work environment is hostile or abusive." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000). Conduct directed to people other than the plaintiff can properly be considered in assessing as hostile environment claim, as the environment of workplace hostility "may exceed the individual dynamic between

the complainant and his supervisor."[5]  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).   The Fourth Circuit has stated that "whether the harassment was sufficiently severe or pervasive to create a hostile work environment is quintessentially a question of fact for the jury, as is the issue of the plaintiff's credibility."  *Conner*, 227 F.3d at 199–200 (internal quotation marks and citations omitted).

Fourth Circuit precedent clearly establishes that the use of the word "nigger" in the workplace is severe.  "Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African–Americans.  'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.'"  *Spriggs*, 242 F.3d at 185 (and citation omitted).

I conclude that Hairston has offered sufficient evidence of a racially hostile work environment to allow a jury to decide whether any such environment was severe or pervasive or imputable to RBP.  Hairston was employed by RBP for only two years, and he has testified that in that relatively brief period of time, he was

---

[5]   RBP has not objected to my consideration of any of Hairston's testimony on hearsay grounds.  Nevertheless, it appears that most of the statements Hairston relayed in his deposition testimony may be admissible either as statements by a party-opponent or for a purpose other than the truth of the matter (namely, to show the effect they had on Hairston).

repeatedly told about race-based animus and the use of racial epithets by supervisors; received an anonymous racially antagonistic and potentially threatening phone call; was subjected to race-based jokes; was excluded from meetings; and was otherwise treated less favorably than white employees with respect to privileges such as use of company cars. If a jury credits this testimony, it could reasonably find that all of these events and circumstances combined to create a hostile work environment in violation of Title VII and § 1981.

RBP asserts a so-called *Faragher-Ellerth* defense, arguing that it is entitled to summary judgment because it had policies in place that directed employees to report harassment through specific channels and, in its view, Hairston failed to do so. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Under the *Faragher-Ellerth* doctrine,

> [t]he employer may escape liability if it can demonstrate, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Spriggs*, 242 F.3d at 186 (internal quotation marks and citations omitted).

In invoking this defense in support of its summary judgment motion, RBP entirely overlooks Hairston's own unwavering testimony that he did report his concerns to his supervisors on several occasions, in accord with the relevant

policies.  RBP cannot eliminate genuine issues of material fact by simply ignoring the plaintiff's testimony where it contradicts the testimony of RBP's witnesses. Moreover, the record does not contain any evidence that RBP investigated allegations of racial animus or harassment during Hairston's employment.  RBP points to the fact that it terminated Brown in part because of his use of the word "nigger," but it fails to provide any explanation for why approximately two months elapsed between Brown's comment and his termination.

Again, I may not weigh evidence or assess credibility at the summary judgment stage; that is the province of the jury.  On the record before me, I cannot conclude that RBP has met its burden of proving its affirmative defense as a matter of law.  I find that genuine issues of material fact preclude the entry of summary judgment on Hairston's harassment claims, and I will therefore deny the defendant's Motion as to those claims.

IV.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 95, is DENIED.

ENTER:  April 12, 2019

/s/  James P. Jones
United States District Judge

- 22 -